REGAN, Judge.
Plaintiff, Walter James, instituted this suit against the defendants, Acme Window Cleaners, and its insurer, Globe Indemnity Company, endeavoring to recover maximum workmen’s compensation for a job-connected injury which he incurred on February 6, 1959, when he fell a distance of thirty feet from a stepladder to the ground. Plaintiff also requested the imposition of statutory penalties and attorney’s fees.
Defendant answered and generally denied the allegations of plaintiff’s petition.
From a judgment in favor of plaintiff, awarding him compensation at the rate of $32.50 per week for a period of 93 weeks, or from the period beginning February 6, 1959, and ending November 30, 1960, phis $500.00 as attorney’s fees, he has prosecuted this appeal. Defendants have also appealed, seeking a reversal of the judgment.
Plaintiff insists that the judgment should be increased to 400 weeks compensation; that the attorney’s fees should also be increased; that statutory penalties be imposed ; and that defendants be cast in judgment for medical expenses. In the alternative, plaintiff requested this court to remand the matter to permit him to amend his pleadings so as to allege that the plaintiff was totally and permanently disabled due to a traumatic neurosis, which was the ultimate result of his injury. The lower court had denied this request, which emanated from plaintiff’s counsel during the course of the trial below.
We heard argument on plaintiff’s alternative plea, and we were then of the opinion that the trial court erred in denying plaintiff’s motion to amend, since amendments to the pleadings in compensation are permissible at any stage of the proceedings, and without considering the merits of the case, we remanded it in order to permit the amendment and the introduction of proof, if any, in support thereof.[1]
The trial court, in due course, received the amended pleadings, heard expert testimony in support of the existence of a traumatic neurosis and amended its first judgment which served to increase plaintiff’s award to $32.50 per week for a period not to exceed 400 weeks.
Again, both the plaintiff and the defendants have appealed. Defendant’s counsel vehemently objects to the entire result, while plaintiff’s complaint is simply limited to the lower court’s failure to award 12j4% statutory penalties on the past due payments.
When this second appeal was argued, counsel asserted that the judgment rendered for 93 weeks of compensation and attorney’s fees had been paid; however, there is nothing in the record to indicate payment. Therefore, both the original and the amended judgments must be reviewed by us.
The first judgment was apparently predicated upon a finding that the plaintiff had incurred a physical disability which continued for a period of 93 weeks after the accident, and that the defendants had arbitrarily withheld compensation payments after May 14, 1959.
It is conceded that plaintiff, a window washer, was injured on February 6, 1959, when he fell from a ladder. The question now posed for our consideration is the extent of his disability.
It is also conceded that plaintiff injured his back in the fall and that his dentures were damaged. However, defendants assert that plaintiff completely recovered on May *542 14, 1959, approximately three months after the accident. This contention was supported by the testimony of four doctors.
Dr. M. D. Paine, a general practitioner, initially examined the plaintiff two weeks after his injury. He was one of the three treating physicians. At that time he found that his left leg was swollen, his teeth were damaged and his back was injured. Although the back injury was diagnosed because of muscle spasm and tenderness, Dr. Paine saw no evidence of a ruptured disc. He treated plaintiff on ten more occasions, which occurred between February 20th and May 8, 1959. Although he complained of pain and of experiencing dizziness three times each day, when he was examined on May 8th, Dr. Paine found nothing to support these complaints. He expressed the ■opinion that the complaints would cease when plaintiff returned to work.
Dr. Dan Baker, a general surgeon, initially examined plaintiff on February 9, 1959, which was a short time after his discharge from Flint Goodridge Hospital. He related that he examined the plaintiff again on May 14, 1959, and discharged him since he had completely recovered from the accident.
In the course of Dr. Baker’s testimony, it was disclosed that the plaintiff had been referred to a Dr. Normann who on May 15, 1959, the day after plaintiff’s discharge, rendered a report which revealed a partial loss of hearing. (This report of Dr. Nor-mann’s was not introduced in evidence, nor was Dr. Normann requested to testify as to the result of his examination. There is absolutely nothing in the record to connect the alleged hearing difficulty with the industrial accident.)
Dr. Howard Karr, a neurosurgeon, examined plaintiff on April 2, 1959. Although plaintiff complained of dizziness and back trouble, the doctor at that time saw no neurological reason why the plaintiff could not return to work, and there was no objective evidence to support the plaintiff’s complaints of back pain.
Dr. Hyman Soboloff, an orthopedist, initially examined the plaintiff on March 17, 1959, and concluded that the back muscles had been injured. Dr. Soboloff examined him again on May 4, 1959, and found the back completely healed. On cross examination, Dr. Soboloff conceded that plaintiff’s complaints of dizziness could be caused by neurological or psychiatric disturbances.
When the insurer discontinued compensation payments on May 14, 1959, its conclusion that the defendant was no longer disabled was thus supported by the medical opinion of four doctors who had either treated or examined him.
In order to establish that a physical disability existed at the time compensation was discontinued, plaintiff relied entirely upon the medical opinion of Dr. Blaise Salatich. It is significant to emphasize at this point that the plaintiff had consulted two doctors before he visited the offices of Dr. Salatich. He testified that he was initially represented by another attorney who sent him to Dr. Battalora and to Drs. Brierre, Hunt and Landry. The reports of these doctors were furnished to the defendant in the course of the trial; however, they were not introduced in evidence, nor were any of these doctors called to testify on behalf of either litigant.
In any event, Dr. Salatich related that he initially examined the plaintiff on October 21, 1959, and diagnosed a “predominantly ligamentous and muscular fascia injury”. He further found “residual disability, embracing dysfunction, pain and restriction of imposing and demanding physical activities”. Dr. Salatich thereafter treated plaintiff on approximately 90 occasions, or until November 21, 1960. He examined him on the day before the trial, which occurred on December 4, 1960, and found no marked improvement in his condition.
Drs. Paine and Soboloff re-examined plaintiff on November 29 and November 30, 1960, which was several days before *543 the trial, and again found nothing to support plaintiff’s complaints of physical disability.
Predicated on the foregoing medical testimony, the trial court reasoned that the plaintiffs disability continued through November 30, 1960.
We have carefully reviewed the record and as a result thereof we are compelled to conclude that this finding is not supported by the evidence contained therein. It is our considered opinion that the plaintiff had completely recovered from any physical injury when he was discharged by Dr. Baker on May 14, 1959.
Obviously the trial court utterly disregarded a part of Dr. Salatich’s testimony, in view of the fact that the judgment awarded compensation to November 30, 1960, and yet on December 4, 1960, Dr. Salatich was still persisting in his finding of a physical disability.
Assuming arguendo that an inference could conceivably be drawn to the effect that the plaintiff was experiencing some difficulty with his hearing at the time he was discharged on May 14, 1959, which may have provoked the result reached by the lower court, there was absolutely no medical testimony to establish that the plaintiff did incur such an affliction, because the doctor who may have made such a diagnosis was not called to testify, nor was his report introduced in evidence.
It is too well settled to require citation in support thereof that a plaintiff in order to recover must prove, with that certainty required by law, that the injuries which he alleged are causally connected with the industrial accident. And this is so despite the fact that the rules of evidence are very wisely relaxed in compensation cases.
In view of what we have said herein-above, we are of the opinion that the lower court erred in rendering a judgment for compensation payments beyond May 14, 1959, and the plaintiff has been fully paid through that date. It logically follows that the award of $500.00 ordered to be paid by the defendant as attorney’s fees is clearly erroneous, since that award is only justified in those instances when the compensation insurer has acted arbitrarily, capriciously or without probable cause in withholding payments.[2]
Turning our attention now to a consideration of plaintiff’s second complaint of injury, we are of the opinion that the evidence adduced herein in support of the amended pleadings does preponderate to the effect that the plaintiff incurred a traumatic neurosis as a consequence of this accident. Dr. Arthur W. Epstein, a psychiatrist and neurologist, testified that the neurosis precludes plaintiff from climbing since he has developed a fear of heights as a result of the accident. Defendants have not exerted the slightest effort to rebut the foregoing opinion by producing an adverse medical expert in the field of psychiatry. They think it is unnecessary. Defendants simply insist that the plaintiff’s fear of heights per se does .not render him totally and permanently disabled in view of the fact that there are innumerable jobs available to him in the common labor market which do not require climbing; and that the plaintiff’s occupation as a window washer unquestionably falls within that category which the jurisprudence has designated a common laborer.
Plaintiff’s work prior to the accident consisted of washing windows and cleaning and waxing floors. He was assigned by his employer primarily to residential jobs. He has never worked from the outside of a building, supported by a safety belt. Although the record contains testimony to the effect that a window washer must be “broken in” before he is sent to a residence alone, we believe that the slight *544 training required does not amount to the teaching of a special skill. We, therefore, conclude that the plaintiff’s occupation fell within the category of a common laborer when the accident occurred.
The foregoing conclusion that plaintiff is a common laborer now brings our rationalization to the inevitable, but interesting, question of whether plaintiff’s fear of climbing renders him totally and permanently disabled within the meaning and the intention of the Workmen’s Compensation Act.
In the relatively recent case of Jackson v. Steel Fabricators,[3] the organ for this court, in answering a similar question which was posed for its consideration, rationalized thusly:
“ * * * it has always been our view that it is sometimes quite necessary to determine whether the injured employee was skilled or was only a common laborer. We have always felt, and we still feel, that if an employee becomes particularly skillful in some work which requires special experience or knowledge and, as a result of an industrial accident, is unable to again engage in that particular specialized service, he is totally disabled even if it is found that he can do other things quite different from those in which he had acquired the special knowledge and experience.
“On the other hand, we have felt, and still feel, that if a common laborer sustains injury which may prevent him from engaging in one or two or even a few particular kinds of common labor but that he is nevertheless able to do many other kinds of common labor, he is not totally disabled and is entitled to compensation for partial disability in some cases where his ability to earn has been reduced, or to compensation based on the impairment of the member where that impairment has not resulted in the reduction of his ability to earn.”
In this case, plaintiff was earning $50.00 per week when he was injured. When the trial hereof occurred, he was employed as a parking lot attendant earning a salary of $33.00 per week, exclusive of tips. He testified that he did not report his tips for income tax purposes; however, he admitted earning approximately $10.00 per week from this source. Thus, his earnings are approximately the same now as they were before he was injured.
In deciding whether an employee is totally and permanently disabled within the contemplation of the act, that is, one who cannot perform the same work he was capable of prior to his injury, it, of course, becomes necessary to distinguish between the inherent characteristics of the skilled and the unskilled laborer. The skilled laborer, who cannot resume his same trade is, obviously, totally and permanently disabled. However, the common laborer who is still able to engage in innumerable other forms of common labor has been considered to' be capable of doing work of the same or similar character.
In a recent case, entitled Lawes v. Houston Fire & Casualty Company,[4] the organ for the court very significantly recognized the distinction between skilled and common labor in determining the extent of disability. Therein the facts revealed that a correctional officer at Angola Penitentiary had injured his ankle. Prior to the injury he was required to operate electrically controlled gates or to close them manually if the electricity failed, to supervise work of *545 the inmates and to “shake them down”. Following his injury he was employed as a laundry supervisor. In disallowing compensation for total and permanent disability, the court reasoned:
“Although the work of the two positions is not identical, so far as we are able to determine from the record it is reasonably similar in nature, particularly since no skill or unusual strength is necessary in either job.1’ (Emphasis added.)
Since we are of the opinion that the inability to climb imposes inconsequential limitations upon plaintiff’s ability to compete for employment in the common labor market, we do not think he is entitled to> recover compensation for total and permanent disability.
For the reasons hereinabove assigned, both judgments are reversed.
Reversed.

. James v. Acme Window Gleaners and Globe Indemnity Company, La.App., 139 So.2d 586, (1962).

. LSA-B..S. 22:658.

. La.App., 90 So.2d 397. (Certiorari denied) .
See also Olivier v. Liberty Mutual Insurance, La.App., 125 So.2d 179 (1960) (4 C.C.A.). 241 La. 745, 131 So.2d 50. Picquet v. Toye Bros. Yellow Cab Co., La.App., 77 So.2d 569 (1955).
These cases provide some interesting sociological ramifications of the subject matter.

. 242 La. 251, 135 So.2d 920 (1961).